IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**WEIRTON MEDICAL CENTER, INC.,**

      Plaintiff,

v.                           **Consolidated at Civil Action No. 5:19-CV-199**

**R&V ASSOCIATES, LTD,**         Judge Bailey

      Defendant.

**R&V ASSOCIATES, LTD,**

      Plaintiff,

v.

**WEIRTON MEDICAL CENTER, INC.,**

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT R&V ASSOCIATES' MOTIONS TO DISMISS

Pending before this Court is Defendant R&V Associates' Motions to Dismiss Amended Complaint [Doc. 26]. The motion has been fully briefed and is ripe for decision. For the reasons hereinafter stated, the motion will be granted in part and denied in part.

### Legal Standard

A motion to dismiss filed under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

1

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing a motion to dismiss, a court may consider public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." *Katyle v. Penn National Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011). This includes documents filed in prior court proceedings. *See Walker v. Kelly*, 589 F.3d 127 (4th Cir. 2009).

## Background

The facts of this case, viewed in the light most favorable to Weirton Medical Center ("WMC") as the non-moving party, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009), include the following:

WMC is a nonprofit community hospital in Weirton, West Virginia. Beginning in 2012, WMC's Board of Trustees engaged R&V to provide management and consulting services to WMC pursuant to a written contract. WMC had fallen upon difficult financial times, and R&V billed itself as a sort of "turnaround" specialist for struggling hospitals. After all, R&V managed an apparent "turnaround" at Wheeling Hospital. WMC hoped that R&V could similarly provide such a "turnaround" in Weirton and relied on R&V's purported skills to achieve that.

The Contract was to be performed by R&V's principal, Vincent C. Deluzio ("Deluzio"). Deluzio is an attorney and further held himself out as an expert for financial, legal, regulatory, staffing, and other issues that WMC faced. WMC relied on R&V's and Deluzio's representations to that effect. Pursuant to the terms of the Contract, R&V and

2

Deluzio were to provide "coordination of operations, marketing, legal and compliance matters, with a goal of improving the financial condition and results of the operations" of WMC.

Though the Contract itself used the terms "management consulting services," R&V's and Deluzio's control was all encompassing. Every WMC officer and employee—including even WMC's CEO—ultimately answered to R&V and Deluzio. In turn, R&V and Deluzio reported only to the Board of Trustees, whose oversight and authority they worked to thwart by, among other things, dramatically reducing the number of Board and finance committee meetings. Indeed, WMC's organizational charts specifically showed every officer, employee, and department of the hospital answering ultimately to R&V and Deluzio—only the Board of Trustees stood above it. R&V and Deluzio ran WMC.

As part of R&V's and Deluzio's control over WMC, they were responsible for, among other things, physician compensation as well as the hiring, recruiting, and acquisition of physicians and physician practices. Such expansions and acquisitions are not inherently bad—so long as they comply with the various federal laws and regulations that govern physician compensation. For example, the Stark Law (42 U.S.C. § 1395nn or "Stark Law") and the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b) or "AKS") constrain the compensation that hospitals like WMC can pay physicians. The key import of the Stark Law and AKS is that hospitals cannot pay physicians more based upon the volume of referrals from the physician to the hospital itself. Violation of the Stark Law or AKS can subject a hospital to significant liability, including through qui tam actions under the False Claims Act. WMC relied on R&V and Deluzio to navigate these legal requirements. Indeed, the Contract itself stated that R&V (and by extension, Deluzio) would "coordinat[e]

3

. . . legal and compliance matters." WMC relied upon R&V's and Deluzio's supposed expertise in these matters, until the Wheeling Hospital Litigation.

In December 2018, this Court unsealed a *qui tam* lawsuit against Wheeling Hospital, styled ***United States ex rel. Longo v. Wheeling Hosp., Inc.***, 5:19-cv-00192 (hereinafter, "Wheeling Hospital Litigation"). Also named as defendants were R&V and its other principal, Ronald L. Violi ("Violi"). R&V served in a key management role at Wheeling Hospital, just as it did at WMC.

WMC became more concerned about the Wheeling Hospital Litigation when the United States Department of Justice joined in the case and filed its own Complaint in Intervention on March 25, 2019. There, the DOJ described the means by which Wheeling Hospital, pursuant to R&V's control, "systematically entered into financial relationships with referring physicians" that violated the Stark Law and/or AKS, thereby "knowingly submit[ing] . . . thousands of false claims" and causing millions of dollars of damages. More particularly, the DOJ Complaint explains that, prior to R&V's hiring, Wheeling Hospital had "experienced financial difficulties." But under R&V's management, "Wheeling Hospital went from losing money from its operations to generating substantial profits." One of the "principal means" by which "R&V engineered Wheeling Hospital's financial turnaround was the hiring of a large number of physicians, primarily as employees" in order to "capture" those employed "physicians' referrals and the resulting revenues" in a way that violated the Stark Law and AKS.

The apparent parallels between R&V's conduct at Wheeling Hospital and R&V's conduct at WMC were shocking. Just as Wheeling Hospital "experienced financial difficulties," WMC was also struggling financially before R&V came in. And just as R&V

4

"engineered Wheeling Hospital's financial turnaround" through physician employment, so did R&V at WMC. Indeed, WMC's Contract with R&V provided the latter with control over "recruitment" and "business combination[s]." Just as R&V's aggressive physician employment, acquisition, and compensation strategies lead to Wheeling Hospital's turnaround, WMC began to wonder whether its change in financial prospects was similarly due to R&V's potential misconduct. These concerns are further bolstered by the fact that WMC itself was mentioned in the DOJ Complaint, as was Deluzio's personal interaction at Wheeling Hospital.

Following the DOJ Complaint, WMC alleges that it became aware that R&V and Deluzio were directing WMC's "legal and compliance matters" not for the benefit of WMC—as required by the Contract—but rather to serve R&V's and its principals' own personal interests in the Wheeling Hospital Litigation. For example, at R&V's and Deluzio's direction, they caused WMC to engage Wheeling Hospital's counsel for the Wheeling Hospital Litigation, David Paragas, to conduct an "independent" investigation at WMC. This was billed as "independent"—and indeed needed to be in order to accurately examine R&V's own conduct. Despite that, R&V and Deluzio nonetheless directed and controlled the investigation. R&V and Deluzio began directing the "independent" audit, not to discover potential non-compliance issues to correct and self-report as required by law, but rather to protect their own interests, both in the Wheeling Hospital Litigation and any potential litigation arising from their work at WMC. This strategy inherently conflicted with the Board's preference—and WMC's own best interests—which was to investigate any potential issues, correct and self-report them, and cooperate fully with any government investigation. That was, and still remains, WMC's approach. That was, and still remains,

5

in WMC's best interests.

Because of this inherent tension and conflict between WMC's interests on the one hand and the interests of R&V, Deluzio, Violi, and Wheeling Hospital on the other hand, the Board of Trustees terminated the supposedly "independent" investigation by R&V's hand-selected counsel and commissioned its own truly independent audit to be conducted by Bowles Rice LLP. R&V and Deluzio would be witnesses in and subjects of that audit, but they would no longer control it. Because the Board's decision went against R&V's and Deluzio's personal interests, they objected to, refused to cooperate with, and attempted to obstruct that second investigation. Some means by which R&V and Deluzio did this are spelled out in WMC's Amended Complaint, but include the following as examples:

1. Threatening to sue WMC for commissioning its own audit and defense strategy (a threat R&V and Deluzio followed through with in this litigation);

2. Threatening to quit and nonetheless fully charge WMC for the remaining balance of payments on the Contract (again, a remedy that R&V and Deluzio seek in this litigation);

3. Attemptg to coerce or intimidate Board members from cooperating or permitting the new audit; and

4. Tampering with witnesses for the new audit, including instructing them how to answer and questioning them after interviews.

Most concerning and obvious, though, was R&V's and Deluzio's alteration of WMC documents in order to falsely lessen liability for R&V and Deluzio. Prior to the Wheeling Hospital Litigation, WMC's organizational charts accurately depicted the fact that all WMC officers, employees, and departments answered ultimately to R&V and Deluzio. But in

6

April 2019—less than one month after the unveiling of the DOJ Complaint—R&V and Deluzio directed a change in the organizational chart to show themselves on equal footing as WMC's CEO. This new representation on the organizational chart is false and was done to deflect blame and culpability away from R&V and Deluzio and onto WMC. This change concocts a theory of lessened liability for R&V and conveys the false impression that Deluzio was a mere consultant, not the de facto CEO.

## **Amended Complaint**

The Amended Complaint filed by WMC [Doc. 25] contains the following eight causes of action:

Count 1 alleges breach of the contract between WMC and R&V;

Count 2 seeks a declaratory judgment that WMC was within its rights in terminating the contract between WMC and R&V and that no further payment is due to R&V;

Count 3 alleges a breach of fiduciary duty by R&V by coordinating WMC's legal and compliance matters for its own benefit;

Count 4 alleges that R&V tortiously interfered with WMC's contract with the Bowles Rice law firm, under which Bowles Rice was to conduct an independent audit;

Count 5 alleges unjust enrichment on the part of R&V in retaining an advance payment of $335,000 which has not been returned;

Count 6 alleges the malicious use of process in R&V knowingly and intentionally including false accusations in its lawsuit against WMC;

Count 7 seeks contribution and indemnity from R&V in the event that WMC is found

to be in violation of the Stark Law or AKS;

Count 8 seeks declaratory judgment that WMC does not owe contractual indemnity to R&V for this action or for the DOJ investigation.

R&V has moved to dismiss each one of the above Counts.

## Discussion

With respect to Count 1 of the Amended Complaint alleging breach of contract, the defendant contends that the action is not ripe and is premature due to the absence of cognizable damages. As noted by the defendant, in order to sustain a claim for breach of contract, the plaintiff must plausibly allege "the following elements: the existence of a valid, enforceable contract, that the plaintiff has performed under the contract, that the defendant has breached or violated its duties or obligations under the contract, and *that the plaintiff has been injured as a result.*" *Wince v. Easterbrooke Cellular Corp*, 681 F.Supp.2d 688, 693 (N.D. W.Va. 2010) (Bailey, J.), citing *Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F.Supp.2d 694, 730 (S.D. W.Va. 2009) (Goodwin, J.) (emphasis added).

In this case, however, the plaintiff has adequately pled damages which have allegedly been incurred, such as the cost of the "independent" investigation sponsored by R&V, the cost incurred as a result of R&V's alleged interference with the Bowles Rice investigation, and the costs already incurred as a result of the cooperation with federal investigators. These are present, not speculative, damages.

While the plaintiff also seeks damages that may be incurred in the future, "[w]hen an injury occurs, the injured party has the right to to bring suit for all of the damages, past,

present and future, caused by the defendant's acts." *Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007), quoting *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir. 1980). *See also* In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 725 F.3d 65 (2d Cir. 65).

This Court finds the allegations of Count 1 sufficient to pass 12(b)(6) muster. The motion seeking dismissal of Count 1 will be denied.

With respect to Count 2 of the Amended Complaint, seeking a declaratory judgment that WMC was within its rights in terminating the contract between WMC and R&V and that no further payment is due to R&V, the defendant contends that this cause of action is inappropriate because the rights have fully matured and the alleged wrongs have been suffered, citing *Hanback v. DRHI, Inc.*, 94 F.Supp.3d 753, 758 (E.D. Va. 2015)(Ellis, J.).

In *Hanback*, Judge Ellis writes:

Section 2201 provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration...." 28 U.S.C. § 2201(a). As courts have uniformly recognized, "[t]his power has consistently been considered discretionary." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996). The Fourth Circuit has provided guidance on the exercise of this discretionary power, commenting that a declaratory judgment action is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.*

The plaintiff responds that there is a substantial issue as to whether the contract

9

was properly terminated and whether WMC owes any additional compensation. The plaintiff also notes that R&V contends that the breach of contract action is premature and that the declaratory judgment action is moot and that the defendant seeks dismissal with prejudice. The defendant can't have it both ways.

It is also important to note that R&V has included a claim for declaratory judgment in its Second Amended Complaint in the consolidated case. See *R&V Assoc., LTD. v. Weirton Medical Center*, Civil Action No. 5:19-CV-246, Doc. 20.

This Court will exercise its discretion and will not dismiss this case at this time. Accordingly, R&V's motion to dismiss Count 2 will be denied.

With respect to Count 3 of the Amended Complaint, alleging a breach of fiduciary duty by R&V by coordinating WMC's legal and compliance matters for its own benefit, R&V contends that the action is barred by the "gist of the action" doctrine. This doctrine essentially prohibits the recasting of a breach of contract claim into a tort action.

"The 'gist of the action doctrine' applies where one of the following four factors is present:

> (1) where liability arises solely from the contractual relationship between the parties; (2) where the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love*, 231 W.Va. 577, 586, 746

S.E.2d 568, 577 (2013). In short, to determine whether a tort claim can be sustained separate from the breach of contract claim, the court must examine 'whether the parties' obligations are defined by the terms of the contract.' *Id.*" ***Rodgers v. Southwestern Energy Co.,*** 2016 WL 3248437 at *3 (N.D. W.Va. June 13, 2016) (Bailey, J.).

This Court believes that under the facts of this case, the claim may separately survive. In *Gaddy*, the West Virginia Supreme Court stated that "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are **defined by** the terms of the contract." 231 W.Va. at 586; 746 S.E.2d at 577.

In addition, in ***Good v. American Water Works, Inc.***, 2016 WL 5441035, *8 (S.D. W.Va. Sept. 27, 2016), Judge Copenhaver quoted from ***Bruno v. Erie Ins. Co.***, 630 Pa. 79, 106 A.3d 48, 63 (2014) stating that "merely because a cause of action between two parties to a contract is based on the actions of the defendant undertaken while performing his contractual duties, this fact, alone, does not automatically characterize the action as one for breach of contract." 630 Pa. at 103, 106 A.3d at 63. The *Bruno* court continued:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract — i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract — then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a **broader social duty** ... then it must be regarded as a tort.

*Id.* at 68 (emphasis added) (citations omitted).

Judge Copenhaver summarized "[i]n sum, when duties and standards of care not ordinarily required by tort law are created by contract, the action must be on contract. When "a broader social duty" owed to all individuals is involved, however, the highest courts in Pennsylvania and West Virginia agree that a cause of action in tort may be preserved." 2016 WL at *8.

The terms of the contract in this case do not define or create a fiduciary duty. In fact, R&V denies that any fiduciary duty is owed. It is the fact that R&V agreed to manage WMC's affairs and to serve as an agent and *de facto* officer of WMC which creates the fiduciary duty.

As noted by plaintiff, "[a]ttorneys enter into representation agreements every day, and yet they owe fiduciary duties to their clients. By R&V's logic, any attorney with such an agreement is immune from fiduciary liability. That is plainly not the law. R&V's and Deluzio's positions as de facto officers, actual agents, and indeed, legal representatives establishes that fiduciary duties did in fact exist. Neither the Contract nor the "independent contractor" label in that Contract detract from this." [Doc. 36, p. 15].

For these reasons, the motion seeking dismissal of Count 3 will be denied.

With respect to Count 4 of the Amended Complaint, alleging that R&V tortiously interfered with WMC's contract with the Bowles Rice law firm, under which Bowles Rice was to conduct an independent audit; the defendant contends that such a claim cannot be advanced unless there is a complete failure of the third party to perform the contract. In West Virginia, a plaintiff must prove:

(1) existence of a contractual or business relationship or expectancy [with Security National Bank or Half Dollar Bank];

12

(2) an intentional act of interference by a party outside that relationship or expectancy . . .;

(3) proof that the interference caused the harm sustained; and

(4) damages.

*Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 217, 314 S.E.2d 166, 173 (1983). *Torbett* does not indicate that a plaintiff needs to prove a complete failure to perform.

In *Kessler v. First Community Bank*, 2018 WL 3150354 (S.D. W.Va. June 26, 2018), Judge Berger found sufficient allegations that the owners of Jarrell's Exxon suffered a reduction in expected ongoing business as a result of the rumors that credit and debit card information was being compromised at Jarrell's Exxon. They have also presented evidence that employees at First Community Bank informed customers that cards were compromised at Jarrell's, advised them not to use cards at Jarrell's, cancelled cards that had been used at Jarrell's and told customers that cards were cancelled because of use at Jarrell's. Judge Berger did not require a total loss of business.

The defendant relies upon *American Select Ins. Co. v. Allegheny Ins. Services, Inc.*, 2012 WL 1109135 (N.D. W.Va. April 2, 2012) (Bailey, J.) to support its claim. In that case, however, the Court was dealing with a claim of improper solicitation of customers or clients. In that case, without a loss of customers there can be no damage. Without damage there can be no claim.

Under the plain language of *Torbett*, however, all that is required is harm and damages. Both are properly alleged here.

For these reasons, the motion seeking dismissal of Count 4 will be denied.

With respect to Count 5 of the Amended Complaint, alleging unjust enrichment on the part of R&V in retaining an advance payment of $335,000 which has not been returned, the defendant argues that there can be no claim for unjust enrichment when the relationship between the parties is governed by a contract. This Court agrees. *See E.g. Rosenbaum v. Price Const. Co.,* 117 W.Va. 160, 184 S.E. 261, 263-64 (1936); *Hanover Resources, LLC v. LML Properties, LLC,* 241 W.Va. 767, 775, 828 S.E.2d 829, 837 (2019); *Federal Savings and Loan Ins. Corp. v. Quality Hotels and Resorts,* 928 F.2d 399, 1991 WL 30211 at *3-4 (4th Cir. 1991)(unpublished)(citing Rosenbaum); *Ohio Valley Health Services & Educ. Corp. v. Riley,* 149 F.Supp.3d 709, 724 (N.D. W.Va. 2015) (Stamp, J.); *Worldwide Machinery LP v. Columbia Gas Transmissions, LLC,* 2019 WL 3558174 (N.D. W.Va. 2019).

The cause of action alleged in Count 5 is subsumed by the breach of contract claim, and the damages sought in Count 5 may, upon proper proof, be recovered therein.

Count 5 will be dismissed.

With respect to Count 6 of the Amended Complaint, alleging the malicious use of process in R&V knowingly and intentionally including false accusations in its lawsuit against WMC, the defendant contends that the Amended Complaint is deficient in that it fails to allege a definite act or threat not authorized by the process. Generally, abuse of process consists of the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process. *Preiser v. MacQueen*, 177 W.Va. 273, 279, 352 S.E.2d 22, 28 (1985); Syl. Pt. 2, *Wayne County*

14

*Bank v. Hodges*, 175 W.Va. 723, 338 S.E.2d 202 (1985).

The *Preiser* Court went on to cite authority from other jurisdictions:

In *Glidewell v. Murray-Lacy and Company*, 124 Va. 563, 98 S.E. 665 (1919), the Supreme Court of Virginia discussed abuse of process:

> The distinctive nature of an action for abuse of process, as compared with the actions for malicious prosecution and false imprisonment, is that it lies for the improper use of a regularly issued process, not for maliciously causing process to issue, or for an unlawful detention of the person.
>
> . . ..
>
> The authorities are practically unanimous in holding that to maintain the action [for abuse of process] there must be proof of a willful and intentional abuse or misuse of the process for the accomplishment of some wrongful object—an intentional and willful perversion of it to the unlawful injury of another.
>
> . . ..
>
> As to the proof of malice, we have seen that such proof is not necessary as to the issuance, but is necessary to the use, of the process, in order to sustain an action of this character.

124 Va. at 569, 571, 576; 98 S.E. at 667, 668, 670.

Furthermore, as the Supreme Court of Virginia stated in *Mullins v. Sanders*, 189 Va. 624, 54 S.E.2d 116 (1949):

> In an action for abuse of process, as distinguished from an

15

action for malicious prosecution, it is not necessary to aver and prove the termination of the proceeding in which the process was issued. It is sufficient that one party has wilfully abused the process after its issuance to the damage of the other.

189 Va. at 633, 54 S.E.2d at 121.

*Id.*, 177 W.Va. at 279-80, 352 S.E.2d at 28-29.

This Court finds that the allegations of the Amended Complaint are insufficient to withstand a Rule 12(b)(6) motion. The doctrine of abuse of process appears to require some improper use of the process after issuance. The Amended Complaint is not clear on the temporal nature of the allegations. Furthermore, Count 6 fails to make a sufficient plausible allegation of damages to WMC.

Accordingly, Count 6 will be dismissed without prejudice. While the cause of action would appear to be subsumed into the breach of fiduciary duty claim, plaintiff is granted leave to file a second amended complaint amending Count 6 only. Such an amendment, if desired, must be filed within 21 days of the date of entry of this Order.

With respect to Count 7 of the Amended Complaint, seeking contribution and indemnity from R&V in the event that WMC is found to be in violation of the Stark Law or AKS, the defendant seeks dismissal on the basis that there can be no implied indemnity when one is provided by contract and that such a claim is premature.

"'The general principle of implied indemnity arises from equitable considerations. At the heart of the doctrine is the premise that the person seeking to assert implied indemnity—the indemnitee—has been required to pay damages caused by a third party—the indemnitor. In the typical case, the indemnitee is made liable to the injured

16

party because of some positive duty created by statute or common law, but the actual cause of the injury was the act of the indemnitor.' Syl. Pt. 2, *Hill v. Joseph T. Ryerson & Son, Inc.*, 165 W.Va. 22, 268 S.E.2d 296 (1980)." Syl. Pt. 2, *Harvest Capita' v. West Virginia Dept. of Energy*, 211 W.Va. 34, 560 S.E.2d 509 (2002).

"'Implied indemnity is based upon principles of equity and restitution and one must be without fault to obtain implied indemnity.' Syl. Pt. 2, *Sydenstricker v. Unipunch Products, Inc.*, 169 W.Va. 440, 288 S.E.2d 511 (1982)." Syl. Pt. 3, *Id*.

"The requisite elements of an implied indemnity claim in West Virginia are a showing that: (1) an injury was sustained by a third party; (2) for which a putative indemnitee has become subject to liability because of a positive duty created by statute or common law, but whose independent actions did not contribute to the injury; and (3) for which a putative indemnitor should bear fault for causing because of the relationship the indemnitor and indemnitee share." Syl. Pt. 4, *Id*.

The defendant is correct in arguing that the case law supports its argument that there can be no implied indemnity where there is an express indemnity clause. That argument misses the mark in this case, inasmuch as the agreement in question, prepared by R&V, does not contain an express indemnification provision in favor of WMC. Accordingly, WMC is left with and entitled to the benefit of implied indemnity.

With respect to the issue of whether the claim is premature, the defendant is correct that there can be no final determination of the entitlement to indemnity until liability is established. Nevertheless, it is common to include the claim for indemnification in the pleadings. In fact, the defendant has included a claim for indemnification in its Second

17

Amended Complaint in this case [5:19-cv-246, Doc. 20].

The motion to dismiss Count 7 will be denied.

With respect to Count 8 of the Amended Compliaint, seeking declaratory judgment, the defendant moved as follows:

> WMC's Count VIII is a dueling Declaratory Judgment claim to Count III of R&V Associates' Second Amended Complaint. Since the assertions in Count VIII can be raised as a defense to R&V's Count III, which was filed first, the Court should dismiss Count VIII for purposes of simplicity and judicial economy.

[Doc. 26, p. 3].

Inasmuch as the WMC v. R&V case (5:19-CV-199) is the lead case in this consolidated action, this Court will decline defendant's invitation. The motion to dismiss Count 8 will be denied.

Finally, the defendant moves to strike the claims for attorneys fees in Counts 1 through 6 and 8 of the Amended Complaint, pursuant to the "American Rule," citing *Hitachi Credit Am. Corp v. Signet Bank*, 166 F.3d 614, 631 (4th Cir. 1994); *American Reliable Ins. v. Stillwell*, 212 F.Supp.2d 621, 633-34 (N.D. W.Va. 2002).

This Court finds that the motion is inadequately briefed and premature. The motion to strike the claims for attorneys fees will be denied without prejudice.

For the reasons stated above:

The motion seeking dismissal of Count 1 is **DENIED**.

The motion seeking dismissal of Count 2 is **DENIED**.

The motion seeking dismissal of Count 3 is **DENIED**.

The motion seeking dismissal of Count 4 is **DENIED**.

The motion seeking dismissal of Count 5 is **GRANTED**.

The motion seeking dismissal of Count 6 is **GRANTED**. Count 6 is **DISMISSED WITHOUT PREJUDICE**. While the cause of action would appear to be subsumed into the breach of fiduciary duty claim, plaintiff is granted leave to file a second amended complaint amending Count 6 only. Such an amendment, if desired, must be filed within 21 days of the date of entry of this Order.

The motion seeking dismissal of Count 7 is **DENIED**.

The motion seeking dismissal of Count 8 is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

**DATED:** December 23, 2019.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE